UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>KENDALL THRIFT,<br><br>    Defendant. | No. 2:14-cr-00308-GEB<br><br>**ORDER DENYING DEFENDANT'S SECOND MOTION TO SUPPRESS EVIDENCE AND REQUEST FOR A <u>FRANKS</u> HEARING** [*] |

Defendant Kendall Thrift moves "to suppress the fruits of [the warranted] search" of his home at 773 Shoreline Point, El Dorado Hills, California, and requests an evidentiary hearing under <u>Franks v. Delaware</u>, 438 U.S. 154 (1978), arguing: "the supporting affidavit of Detective Kyle Tedford contains material misrepresentations and omissions of fact[] critical to the determination of probable cause." (Def.'s Mot. to Suppress[1] ("Def.'s Mot.") ii, 1:20-26, ECF No. 35.) Defendant contends the misrepresentations and omissions undermine "the perceived

---

[*] The hearing for oral argument on this motion scheduled for January 22, 2016, is vacated since this matter is suitable for decision without oral argument. The January 22, 2016 status conference remains on calendar.

[1] This is Defendant's second suppression motion. Defendant filed an earlier suppression motion on May 4, 2015, arguing the affidavit presented in support of the search warrant authorizing the search of his home did not provide probable cause for the search. (ECF No. 21.) That motion was denied in an order filed on August 5, 2015. (ECF No. 30.)

1

relationship between Jeremy Zahn and [his] home," which "was the crux of probable cause." (Id. at 1:27-28, 4:8-10.)

The government opposes the motion to suppress and request for a Franks hearing.

**FACTUAL BACKGROUND**

**A.   The Charged Offenses**

Defendant is charged with conspiracy to distribute and to possess with intent to distribute marijuana in violation of 21 U.S.C. § 846, 841(a)(1), possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1), and possession of a firearm by a prohibited person in violation of 18 U.S.C. § 922(g)(9). (Indictment, ECF No. 8.)

**B.   The Search Warrant**

The applicable search warrant authorized the search of 773 Shoreline Point for, *inter alia*, "[a]ny firearms[,] . . . [m]arijuana[, and] paraphernalia commonly associated with the possession, packaging, and/or sale of marijuana." (Search Warrant at THRIFT 0058,[2] Decl. John Virga ISO Def.'s Mot. ("Virga Decl.") Ex. A, ECF No. 35-2.) Detective Kyle Tedford authored the affidavit presented in support of the search warrant. That affidavit contains, in relevant part, the following information:

> On 3/17/2014, [Citrus Heights Police Officer Herman] conducted a traffic stop on a silver 2000 Lexus (CA license plate 6BTB799), for a vehicle code violation. Officer Herman identified the driver as Jeremy Zahn by his valid California Driver's license. Officer Herman conducted a records check of Zahn, and [determined] he was on active California Post Release Community Supervision (PRCS) probation through October 2015, and is a

---

[2]   For ease of reference, certain documents are referred to by their Bates number, which is located at the bottom, right-hand corner of the document.

convicted felon.

    Officer Herman smelled a strong odor of marijuana . . . emitting from inside of the vehicle. Officer Herman searched the interior of the vehicle, pursuant to Zahn's probation conditions, and located a . . . cellular phone . . . . Officer Herman searched the phone and located several photographs contained within Zahn's phone[, including the following images:] . . . .

    A large amount of what appears to be marijuana, totaling at least twenty five pounds, packaged in approximately one pound increments. [Based on his] training and experience, [Detective Tedford stated this] amount of marijuana, . . . packaged separately in approximately one pound increments, is for sales.

    A large amount of US currency[:] . . . six stacks of bills with $100 bills on the top. There was another photograph of 22[] $100 bills spread out on an unknown person['s] lap inside of a vehicle.

    . . . [A]n AK-47 style long rifle . . . , two AR-15 type of long rifles, a Glock semi-automatic hand gun with Zahn's right hand on the gun, identified by Zahn's right hand tattoos; And an unknown make semi-automatic/or automatic style hand gun with a large magazine. Officer Herman noticed the subject holding the Glock semi-automatic handgun was Zahn, as evidence[d] by the tattoos Herman observed on Zahn's arm at the time of the stop be[ing] the same as the tattoo seen in the photograph.

    Based on [Detective Tedford's] training and experience[,] as well as conversations [he] ha[s] had with other experienced detectives, [Detective Tedford states] that marijuana/narcotics dealers often are in possession of firearms to protect themselves from subjects they are going to sell marijuana/narcotics to[]. A CII records check on Zahn revealed he is a convicted felon[] and cannot possess any firearms . . . . Furthermore, Zahn's probation conditions state that he cannot possess firearms, nor be in the presence of anyone in possession of any dangerous weapons.

3

Officer Herman [also] searched text messages located in Zahn's phone. Officer Herman located several text messages relating to the sales of marijuana. . . .

Officer Herman and other CHPD Officers went to Zahn's residence . . . to conduct a probation search . . . . Officer Herman located a gallon size plastic zip lock bag that was approximately 2/3 full of processed marijuana (approximately 6-8 ounces). Officers searched the garage and located several large grow lamps and inverters, which were not hooked up at that time. . . .

Based on [Detective Tedford's] training and experience[, he stated that] subjects who possess large grow lamps and inverters[] often use[] the lamps and inverters to grow marijuana.

Based on [his] training and experience, and [by] speaking with other experienced Detectives, [Detective Tedford opined] from the text messages, photographs of the firearms, the marijuana, and the large lamps, that Zahn is currently involved with selling/purchasing/manufacturing marijuana and may be in possession [of] or have access to firearms.

. . . .

During the month of March[] 2014, Detective A. Azevedo drove to [Zahn's residence], and observed a silver Lexus parked in the driveway . . . registered to Zahn.

Based on Zahn's probation status, detective Azevedo and probation officer C. Cottengim affixed a tracking device to the silver Lexus [in] which Zahn had been previously stopped. A tracking device [was] affixed to the vehicle . . . for approximately 1[5] days, [when] it [was] repeatedly observed, via its Internet tracking system by Detective Azevedo, as stopping for long periods of time, several hours at [Defendant's home]. During the course of the approximately 1[5] days in which the tracking device was affixed to the vehicle, probation officer Cottengim physically observed the silver Lexus . . . in the driveway of [Defendant's home].

4

On 4/9/2014, at approximately 0930 hours, Detective Azevedo observed via the online tracking system that the tracker affixed to Zahn's vehicle was currently stopped at [Defendant's home]. Detective Azevedo and probation officer Cottengim responded to the location and observed the vehicle in the driveway until approximately 1545 hours when Zahn was observed entering the vehicle and leaving the area in the vehicle. Officers advised Citrus Heights Police Department on-duty officers of its location utilizing the online tracking system at which time a traffic stop was conducted on the vehicle at approximately 1600 hours.

A probation search of the vehicle and Zahn's person yielded two sets of keys, approximately $831 in US currency, and three large brown packages affixed with UPS labels each going to different locations. A K-9 officer responded to the scene at which time the K-9 alerted on the packages. Within one of the packages, officers located . . . approximately 15.6 (total net weight) pounds of a green leafy substance which they immediately recognized as processed marijuana. . . .

Officers conducted a probation search at [Zahn's residence], and located several items of marijuana packaging indicia[, including] several zip top bags containing a green leafy substance which they recognized as marijuana. . . . Within the garage of the residence, officers located four (4) 1000 kilowatt bulbs and two (2) electronic ballasts, along with several electronic timers and wiring kits. . . .

Officers also located a small container with a golden brown tacky substance which they immediately recognized as cannabis hash oil. Officers also located a ceramic plate within the garage of the residence which also had cannabis hash oil upon it.

Based on the above listed events, the items located in the possession of Jeremy Zahn as well as the items located at his place of residence, it [wa]s the [stated] belief of [Detective Tedford] that officers w[ould] locate additional evidence of marijuana sales and marijuana cultivation at [Defendant's home].

5

>      Based on [Detective Tedford's] training, experience and/or conversations that [he has] had with other Law Enforcement Officers and/or reports that [he has] read:
>
>      [Detective Tedford stated that he] know[s] . . . the trafficking of large quantities of marijuana requires the cooperation and association of numerous individuals. As a result, persons who traffic in marijuana will often possess documents that will identify other members of the organization . . . .
>
>      [Detective Tedford further stated:] that persons engaged in a conspiracy to commit felony crimes often communicate with each other and coordinate their drug trafficking activities by telephone and /or cellular phone[;] . . .
>
>      . . . that persons engaged in the possession of marijuana for sales, and the transportation of marijuana for sales, and the cultivation of marijuana, will often arm themselves with a firearm for protection against robbery or personal harm[;]
>
>      . . . that individuals engaged in the . . . sales, possession, and transportation of marijuana/narcotics will often keep additional locations and/or storage containers, commonly referred to as ["]stash houses["] . . . in which to stockpile or hide their illicit items of contraband or illegal activity from law enforcement[,] . . . especially . . . individuals who are currently under probation or have a searchable status.
>
>      [Detective Tedford opined] that Zahn's observed behavior and observed association with [Defendant's] residence, via the online tracking system related to the tracker affixed to his vehicle, is indicative of his familiar association [thereto]. The large quantities of time spent at this residence, several hours spent on numerous days, indicate a serious association and familiarity with the residence which, in [his] training and experience, extends [Zahn's] association further than that of a quick drop off or casual visit.

6

> . . . [Detective Tedford stated that he] believe[s] . . . the occupants residing at the location listed on th[e] Search Warrant, have committed, and are engaged in an ongoing conspiracy to commit, the felony crime of possession for sales of marijuana, sales of marijuana, transportation of marijuana, unlawful possession of firearms and ammunition, and that evidence of these crimes will be found at the [location] listed on th[e] Search Warrant.

(Aff. Det. Kyle Tedford ISO Search Warrant ("Tedford Aff.") at THRIFT 0061-66, Virga Decl. Ex. A, ECF No. 35-2.)

### C. Additional Information Concerning the Lexus

Citrus Heights Police Department Detective A. Azevedo prepared a narrative concerning his participation in Jeremy Zahn's investigation. His narrative states in relevant part:

> I ran a records check of [the silver Lexus's] California license plate: 6BTB799, and the registered owner of the vehicle was Alexis Cardenas . . . . Officer Herman had told me that Cardenas is the current girlfriend of Zahn, they currently live together, and have a child in common. From my training and experience, subjects who are on probation or parole, often drive vehicles that are not registered to them to avoid being stopped by law enforcement.
>
> Probation Officer Cottengim, also received information from Zahn's probation officer that she had seen Zahn drive the silver Lexus several times to his probation classes.
>
> Based on the information that Zahn was stopped driving the silver Lexus on 3/17/14, he drives the silver Lexus to his probation appointments, and that he lives with Cardenas, . . . Zahn has full access to the silver Lexus.
>
> On 3/20/14 and 3/21/14, I drove by [Zahn and Cardenas's residence] and saw the silver Lexus with the license plate 6BTB799[] parked in the driveway on two separate occasions.

7

        On 03/25/14, at approximately 2130 hours, Probation Officer Cottengim and I, placed a GPS tracker on the silver Lexus (CA license plate 6BTB799), which was located in the driveway of [Zahn and Cardenas's residence]. I had access to the tracker information through the internet . . . . One location that the vehicle traveled to[] several times, and [in which] the vehicle was parked for several hours, was in the area of Shoreline Pointe, El Dorado Hills, Ca.

        The stops in the area of Shoreline Pointe, El Dorado Hills, Ca are as follows:

        On 3/26/14, at 1237 hours, the tracke[r] indicated the vehicle traveled to the area of 776 Shoreline Pointe, El Dorado Hills, Ca. The vehicle was parked at that location for 4 hours and 33 minutes. Probation Officer Cottengim had driven up . . . Shoreline Pointe, and saw the silver Lexus (CA license plate 6BTB799), in the driveway of 773 Shoreline Pointe.

        On 3/30/14, at 1515 hours, the tracker indicated the vehicle traveled to the area of 765 Shoreline Pointe, El Dorado Hills, Ca. The vehicle was parked at that location for 6 hours and 14 minutes.

        On 4/3/14, at 1833 hours, the tracker indicated the vehicle traveled to the area of 765 Shoreline Pointe, El Dorado Hills, Ca. The vehicle was parked at that location for 3 hours and 29 minutes.

        On 4/4/14, at 1223 hours, the tracker indicated the vehicle traveled to the area of 775 Shoreline Pointe, El Dorado Hills, Ca. The vehicle was parked at that location for 1 hour and 32 minutes.

        On 4/7/14, at 1603 hours, the tracker indicated the vehicle traveled to the area of 765 Shoreline Pointe, El Dorado Hills, Ca. The vehicle was parked at that location for 4 hours and 40 minutes.

        On 4/8/14, at 0923 hours, the tracker indicated the vehicle traveled to the area of 776 Shoreline Pointe, El Dorado Hills, Ca. The vehicle was parked at that location for 3 hours and 46 minutes.

On 4/9/14, at 0936 hours, the tracker indicated the vehicle traveled to the area of Shoreline Pointe, El Dorado Hills, Ca. The vehicle was parked at that location for 6 hours and 5 minutes.

. . . .

On 4/8/14, at approximately 1605 hours, Probation Officer Cottengim and I[] were driving in Probation Officer Cottengim's unmarked Sacramento County vehicle. We traveled to the area o[f] San Juan Ave and Greenback Ln, where the tracker indicated . . . the vehicle was located. We arrived in the parking lot of 6145 San Juan Ave (Burlington Coat Factory). We saw the silver Lexus parked in the parking lot. We later identified Zahn[] leaving Burlington Coat Factory and get[ting] into the silver Lexus. Zahn drove the vehicle out of the parking lot and we followed the vehicle. Zahn drove back to his residence . . . .

On 4/9/14, at approximately 1200 hours, I looked at the tracker information on the internet and the tracker showed the vehicle was parked in the area of Shoreline Pointe, El Dorado Hills, Ca. The tracker indicated that the vehicle was parked at that location since 0936 hours.

At approximately 1400 hours, Probation Officer Cottengim and I[] traveled to the area of Shoreline Pointe, El Dorado Hills, Ca. We were driving Probation Officer Cottengim's unmarked Sacramento County Probation vehicle. We arrived in the area of Shoreline Pointe at approximately 1430 hours.

We drove up Shoreline Pointe, and I saw the silver Lexus parked in the driveway of 773 Shoreline Pointe, El Dorado Hills. . . .

Probation Officer Cottengim and I stayed in the area of Shoreline Pointe and Lakehills Dr. At approximately 1540 hours, Probation Officer Cottengim and I saw the silver Lexus leave the address of 773 Shoreline Pointe, and travel[] southbound on Lakehills Dr. Probation Officer Cottengim and I followed the silver Lexus and confirmed the license plate of 6BTB799. We followed the vehicle[] the entire route, and we watched the vehicle the entire route. . . .

> . . . .
>
> I contacted our Special Investigations Sergeant Wheaton, and explained to Sergeant Wheaton that we believed that Zahn was driving back to Citrus Heights. Sergeant Wheaton advised motorcycle unit Officer D. Jones to attempt to stop the silver Lexus.
>
> Officer D. Jones made a traffic stop on the silver Lexus for a CVC violation[] . . . in Citrus Heights. Officer D. Jones made contact with the driver Zahn, who identified himself by his California Driver's license. At no time did Zahn stop at any addresses or any shopping centers after leaving the 773 Shoreline Pointe address to where he was stopped by Officer D. Jones.

(Det. A. Azevedo Narrative at THRIFT 0010-12, Virga Decl. Ex. B, ECF No. 35-3 (internal citations omitted).)

Sacramento County Probation Department Deputy Probation Officer C. Cottengim also wrote a report concerning his involvement in Jeremy Zahn's investigation. His report states in relevant part:

> I conducted a records check on Jeremy Zahn . . . and found him to be on active [Post Release Community Supervision] . . . . I conducted a records check and found the Lexus to be registered to Alexis Cardenas . . . . I searched the Probation database (PIP) and found his assigned Probation Officer to be Senior Probation Officer B. Curry. I reviewed Officer Curry's probation notes and then telephoned her to gather more intelligence. I contacted Officer Curry and advised her of Officer Herman's findings. She stated that Cardenas and Zahn were in a dating relationship, had a child together[,] and lived together [in] . . . Citrus Heights . . . . She informed me that she had seen Zahn driving the Lexus on occasions and that Zahn usually reported to the Probation Office driving the Lexus. . . .
>
> According to Probation records, on 9/9/13 Zahn arrived at the Probation Office driving the Lexus. . . .

10

1  (Deputy C. Cottengim Report at THRIFT 0046, Virga Decl. Ex. B,
2  ECF No. 35-3.)

3                              **DISCUSSION**

4          Defendant argues: "The only link in [Tedford's]
5  affidavit between illicit activity and 773 Shoreline Point is
6  Jeremy Zahn. Because Mr. Zahn was only seen at the property one
7  time, the connection between Zahn and the property is made almost
8  entirely through the Lexus that was being tracked." (Def.'s Mot.
9  5:26-28.) Defendant continues:

> In order to enhance the appearance of
> [Zahn's] familiarity with the property, the
> affidavit states that Detective Azevedo ran a
> check and saw the Lexus was "**registered to
> Zahn**." [Tedford Aff. at THRIFT 0064]. . . .
> [T]he Affidavit omits all mention of the
> Lexus' true owner, Alexis Cardenas, and only
> refers to the car as "**Zahn's**." The author of
> the affidavit knew that these statements were
> false and misleading.
>
>                . . . .
>
>    The affidavit also stated that the Lexus
> "had been repeatedly observed, via its
> Internet tracking system by Detective
> Azevedo, as stopping for long periods of
> time, several hours **at 773 Shoreline Point**."
> [Id.] This also was incorrect. Detective
> Azevedo, in his report, never stated that the
> GPS tracker showed the Lexus to be **at** 773
> Shoreline Point. Instead, he summarized times
> the car was in the Shoreline Point **area**.
>
>    The affidavit states that the GPS
> tracker reflected Zahn's whereabouts. In
> doing so, the affidavit glosses over the
> logical leap that is required. The Lexus'
> location is not one and the same with Zahn's
> own location.

(Def.'s Mot. 4:8-28 (emphasis added).) Defendant also faults
Tedford for omitting "reference [in his affidavit] to what time
of day the Lexus was purportedly at the Shoreline Point location,

                                11

how long [and at what time of day] the Lexus was at other locations," the fact "that none of Mr. Zahn's keys or garage door openers worked at 773 Shoreline Point[,]" "reference to cars that Zahn owned or how often he drove those cars[,]" and "information about how often Alexis Cardenas drove the Lexus (that she owned)." (Id. at 5:8-16.) Defendant argues:

> These omissions prevented the magistrate from having a frame of reference for how strong the connection was between the Lexus and Zahn and, in turn, from having an accurate picture of the connection between Zahn and 773 Shoreline Point. Instead of presenting all the facts known to law enforcement, the affidavit misrepresented and omitted facts to assert that Mr. Zahn's regular presence at 773 Shoreline Point was an established fact.

(Id. at 5:16-21.)

The government rejoins, *inter alia*, that "the Court should deny the motion . . . because the defendant has failed to make a substantial preliminary showing that the affidavit contained any material[] false statements or omissions." (Gov't Opp'n 1:26-2:4, ECF No. 36.) The government argues: "The test of materiality is whether the affidavit, when corrected, no longer supports a probable cause finding. . . . [Here, e]ven if the [referenced alleged misstatements and omissions were corrected], the finding of probable cause is undisturbed." (Id. at 8:25-9:2, 15:15-17.)

"To [obtain] a hearing on whether a warrant is invalid under Franks, a defendant must make 'a substantial preliminary showing' that the affiant knowingly or recklessly included a false statement in the warrant affidavit and that the allegedly false statement was 'necessary to the finding of probable

12

cause.'" United States v. Christensen, --- F. App'x ----, 2015 WL 5011989, at *1 (9th Cir. 2015) (quoting Franks, 438 U.S. at 155-56); accord United States v. Ruiz, 758 F.3d 1144, 1148 (9th Cir. 2014). "A similar standard applies to omissions in a warrant affidavit." Christensen, 2015 WL 5011989, at *1 (citing United States v. Stanert, 762 F.2d 775, 781 (9th Cir. 1985)). "Knowing or reckless falsehoods or omissions are immaterial when the affidavit would still support probable cause after the purported falsehoods are removed and omissions included." Id. (citing United States v. Garcia-Cruz, 978 F.2d 537, 541 (9th Cir. 1992)).

"Assessing whether probable cause exists is a 'common sense determination.'" Ruiz, 758 F.3d at 1148 (quoting United States v. Hall, 113 F.3d 157, 159 (9th Cir. 1997)). "The probable cause standard for a search warrant is whether . . . there was 'a fair probability that contraband or evidence of a crime would be found in a particular place.'" Id. (brackets omitted) (quoting United States v. DeLeon, 979 F.2d 761, 764 (9th Cir. 1992)). "For probable cause, an affidavit must establish a reasonable nexus between the . . . evidence [sought] and the location to be searched." United States v. Crews, 502 F.3d 1130, 1136-37 (9th Cir. 2007). "The . . . judge need not determine 'that the evidence is more likely than not to be found where the search takes place. The [judge] need only conclude that it would be reasonable to seek the evidence in the place indicated in the affidavit.'" Ruiz, 758 F.3d at 1148 (ellipses omitted) (quoting United States v. Ocampo, 937 F.2d 485, 490 (9th Cir. 1991)).

"Direct evidence that contraband or evidence is at a particular location is not essential to establish probable cause

to search the location. [The judge] is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense." United States v. Anguelo-Lopez, 791 F.2d 1394, 1399 (9th Cir. 1986) (internal citation omitted). "Under the totality of the circumstances . . . , otherwise innocent behavior may be indicative of criminality when viewed in context." United States v. Chavez-Miranda, 306 F.3d 973, 978 (9th Cir. 2002). "Additionally, . . . judges may rely on the training and experience of affiant police officers." Id.

Here, Defendant has not shown that Detective Tedford's misstatement concerning the Lexus's registration or inclusion of the detailed tracking information concerning the Lexus's location is material, i.e., that "an affidavit containing the [corrected and] omitted [information] would [not] . . . provide[] a basis for a finding of probable cause." Chavez-Miranda, 306 F.3d at 979. Even though Zahn was not the Lexus's registered owner, the record establishes Zahn often drove it. The Lexus was registered to his girlfriend, with whom he lived and had a child; Zahn's assigned probation officer stated "Zahn usually reported to the Probation Office driving the Lexus"; Zahn was stopped while driving the Lexus on March 17, 2014; Zahn was observed driving the Lexus after leaving a Burlington Coat Factory store on April 8, 2014; and Zahn was again stopped while driving the Lexus on April 9, 2014, the day the search warrant was issued. (Azevedo Narrative at THRIFT 0010-11; Cottengim Report at THRIFT 0046.)

Further, the GPS tracking data referenced in Detective Azevedo's Narrative evinces the Lexus was in the immediate

14

vicinity of Defendant's home[3] for a total of more than 30 hours over a fifteen-day period at various times of day, for example, 9:23 a.m., 12:23 p.m., 3:15 p.m., and 6:30 p.m. (Azevedo Narrative at THRIFT 0010-11.) Also, the Lexus was observed in the driveway of Defendant's home on two of those days. (Id. at THRIFT 0010-12.)

Nor has Defendant shown that the remaining referenced omissions are material, i.e., information concerning how often Ms. Cardenas drove the Lexus, where and for how long the Lexus was at other locations, if Zahn owned and/or drove another vehicle(s), and whether Zahn possessed a key or garage door opener that worked at Defendant's home. Regardless of the answers to those inquiries, it would "be reasonable to seek the evidence" in Defendant's home. Crews, 502 F.3d at 1137. As corrected and supplemented, Tedford's affidavit sufficiently connected Zahn to Defendant's residence such that a "reasonable nexus [existed] between the . . . evidence [sought] and the location to be searched." Id. at 1136-37; see, e.g., United States v. Christian, 554 F. App'x 188, 190 (4th Cir. 2013) (indicating evidence that the defendant "regularly spent time" at a location and a police officer's assertions based on his experience that the defendant would "likely store his drugs and related items . . . at a residence or business which is used as a 'stash house'" supported probable cause for a warrant to search the apartment).

---

[3] Defendant's house number was 773 Shoreline Point; the GPS tracking data "indicated the vehicle traveled to the area of" 765, 775, and 776 Shoreline Point.

15

For the stated reasons, Defendant's suppression motion and request for a Franks hearing are DENIED.[4]

Dated:   January 19, 2016

*[signature]*
GARLAND E. BURRELL, JR.
Senior United States District Judge

---

[4] In light of this ruling, the Court "do[es] not reach the government's argument that [Defendant] lacked standing to challenge the search." United States v. Garcia-Gillalba, 585 F.3d 1223, 1234 n.6 (9th Cir. 2009).